UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| VALERIE K. LEWIS, on behalf of<br>L.M.R.J., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:13-CV-1169 (CEJ) |
| | ) | |
| CAROLYN W. COLVIN, Commissioner<br>of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

This matter is before the Court for review of an adverse ruling by the Social Security Administration.

## I. Procedural History

On April 8, 2010, Valerie Lewis filed an application on behalf of her minor daughter, plaintiff L.M.R.J., for supplemental security income (SSI) benefits under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381 *et seq.* (Tr. 137-140). The application alleged that disability began on January 1, 2005. After the application was denied on initial consideration (Tr. 71-74), plaintiff requested a hearing from an Administrative Law Judge (ALJ). See Tr. 78-83 (acknowledging request for hearing).

Plaintiff, Lewis, and counsel appeared for a hearing on February 29, 2012. (Tr. 31-69). The ALJ issued a decision on April 12, 2012 denying plaintiff's application (Tr. 11-26), and the Appeals Council denied plaintiff's request for review on April 19, 2013. (Tr. 1-6). Accordingly, this decision stands as the Commissioner's final decision.

## II. Evidence Before the ALJ

### A. Disability Application Documents

According to the application for SSI benefits, plaintiff was born in September 1999. (Tr. 137). The Disability Report lists plaintiff's disabling conditions as attention deficit hyperactivity disorder (ADHD), Asperger's syndrome, and obsessive-compulsive disorder (OCD). Her medications were Zoloft,[1] Tenex,[2] and Strattera.[3] (Tr. 159-166). In the Supplemental Questionnaire, plaintiff's mother stated that plaintiff is able to play video games and use a computer, but that she has difficulties focusing for an extended period of time. Plaintiff's mother wrote that plaintiff challenges authority, is disrespectful, and "throws fits." (Tr. 168-169).

According to the Function Report, plaintiff wears eyeglasses for nearsightedness; has problems speaking clearly, but she can be understood some of the time by people who do not know her well and most of the time by people who do know her well; is able to deliver telephone messages, talk with family and friends, repeat stories, tell jokes accurately, explain why she did something, and use sentences with "because," "what if," and "should have been;" does not have hearing difficulties; is able to

---

[1] Zoloft, or Sertraline, is a member of the SSRA class and is used to treat depression, obsessive-compulsive disorder, panic attacks, posttraumatic stress disorder, and social anxiety disorder. It is also used to relieve the symptoms of premenstrual dysphoric disorder. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a697048.html (last visited May 2, 2014).

[2] Tenex is a brand name for Guanfacine, which is used alone or in combination with other medications to treat high blood pressure or to control symptoms of ADHD. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601059.html (last visited May 2, 2014).

Strattera is a brand name for Atomoxetine, which is used as a part of a total treatment program to increase the ability to pay attention and decrease impulsiveness and hyperactivity in children and adults with ADHD. http://www.nlm.nih.gov/ medlineplus/druginfo/meds/a603013.html (last visited May 2, 2014).

progress in learning; is not limited in her physical abilities; is able to make new friends; generally gets along with adults and teachers; and is able to take care of her personal needs, such as brushing her teeth, eating, or washing herself, but has difficulties paying attention and sticking with a task.  (Tr. 144-155).

## B.  School Records

The record contains an Individualized Education Program (IEP) report, dated April 19, 2011. (Tr. 195-211).  Plaintiff was then a 5th grade student in the Laclede County School District.  The report states that plaintiff underwent an initial evaluation in April 2008, which resulted in a diagnosis of speech impaired-sound system disorder. This disorder causes her "to display a w/r substitution and a tongue thrust which results in a distortion of the /s and z/ sounds." (Tr. 207).  For example, plaintiff pronounces the words horse as "horth," stove as "thtove," and eggs as "eggth." Testing revealed that "sound errors [were] occasionally noticed in continuous speech." (Tr. 208).  Her overall speech intelligibility was judged to be understandable, but distortions "made her speech have an immature sounding quality." (Tr. 195, 209). No concerns were noted in areas of intellectual/cognitive, hearing, or vision (other than requiring glasses for distance vision).

Plaintiff's classroom teacher, April Pulley, described plaintiff's motor skills to be average, while plaintiff's mother described them to be of "lower quality." (Tr. 206). Pulley described plaintiff's adaptive behavior to be age-appropriate, while plaintiff's mother found her to be "lazy" and "sloppy." (Tr. 207).  Pulley reported that plaintiff performed at average levels in math, reading, and language, but that "many times her medicine or home routine [made] her very tired" and that she had trouble staying awake in class.

Plaintiff scored average in reading and reading comprehension and her current grades were listed as a B in language arts, a B- in spelling, a C in math, a B- in science, and a B+ in social studies. In terms of social and emotional behavior, Pulley noted the following areas of concern: "defiance of rules, off-task behaviors, attention-seeking behaviors, outbursts of anger, improper interaction with authority, does not get along well with peers, emotional difficulties and home problems." (Tr. 209). The IEP determined that she would participate in regular classes 80% of the time (Tr. 202).

On June 9, 2011, plaintiff's speech therapist, Lori Hyde, completed an overall functioning questionnaire for the Social Security Administration (SSA). (Tr. 305-312). Hyde based her responses on observations that she made during biweekly speech therapy sessions with plaintiff. Hyde wrote that "during speech class, [plaintiff] always has trouble focusing. She never seems to know when it is her turn, where we are in the activity, etc." Hyde stated that plaintiff is "always lethargic and constantly reports being tired. She frequently falls asleep during speech. She often makes rude noises to distract others." (Tr. 307). In terms of interacting and relating with others, Hyde wrote that plaintiff "usually just requires reminders that what she is doing/saying are not appropriate." (Tr. 308). Hyde also noted that plaintiff sometimes did not exhibit good personal hygiene. (Tr. 310).

On February 10, 2012, Hyde, completed a questionnaire for the Social Security Administration. (Tr. 476-483). In regards to acquiring and using information, Hyde reported that plaintiff had no problems reading or comprehending written material; had slight problems understanding school/content vocabulary, providing organized oral explanations and adequate descriptions, and recalling and applying previously learned material; had obvious problems understanding and participating in class discussions; and had serious problems comprehending oral instructions. (Tr. 477).

In terms of attending and completing tasks, Hyde reported that plaintiff had no problem completing work accurately without careless mistakes; had slight problems carrying out single-step instructions, organizing her things and school materials, and completing assignments; had obvious problems paying attention when spoken to directly, sustaining attention during play/sports activities, focusing long enough to finish assigned activity or task, carrying out multi-step instructions, waiting to take turns, and changing from one activity to another without being disruptive; and had serious problems refocusing to task when necessary, working without distracting herself or others, and working at a reasonable pace. (Tr. 478).

In terms of interacting and relating with others, Hyde reported that plaintiff had no problem using adequate vocabulary or grammar to express thoughts/ideas in everyday conversation; had slight problems respecting/obeying adults in authority, relating experiences and telling stories, and interpreting meanings of facial expressions; had obvious problems playing cooperatively with other children, making and keeping friends, asking permission appropriately, following rules, and taking turns in a conversation; and had serious problems seeking attention and expressing anger appropriately and introducing and maintaining relevant and appropriate topics of conversation. (Tr. 479).

In terms of caring for herself, Hyde reported that plaintiff had no problem caring for her physical needs, cooperating in or being responsible for taking medications, or using good judgment regarding personal safety and dangerous circumstances; had slight problems identifying and appropriately asserting emotional needs, responding appropriately to changes in own mood, and using appropriate coping skills to meet daily demands of school environment; and had obvious problems handling frustration appropriately, being patient, and taking care of personal hygiene. (Tr. 481).

On February 13, 2012, plaintiff's 6th grade teacher, Kent Golchert, completed the same questionnaire. (Tr. 467-473). Golchert wrote that plaintiff was very independent, would rarely seek extra help on problems and often displayed defiance when confronted with correction. (Tr. 468). Golchert wrote that plaintiff turned in late assignments two to three times per month and that she had difficulties making friends in her grade level. (Tr. 468-470). He stated that she had no problems moving about, manipulating objects, or caring for herself.

In terms of acquiring and using information, Golchert reported that plaintiff had slight problems comprehending oral instructions, understanding school/content vocabulary, reading and comprehending written material, understanding and participating in class discussions, and learning new material; and had obvious problems comprehending and doing math problems, providing organized oral explanations and adequate descriptions, expressing ideas in writing, recalling and applying previously learned material, and applying problem-solving skills in class discussions. (Tr. 468).

In terms of attending and completing tasks, Golchert reported that plaintiff had no problems refocusing to task when necessary, carrying out single or multi-step instructions, waiting to take turns, or changing from one activity to another without being disruptive; had slight problems focusing long enough to finish an assigned activity or task, organizing her things or school materials, completing assignments, working without distracting herself or others, and working at a reasonable pace; had obvious problems sustaining attention during play/sports activities and completing work accurately without careless mistakes; and had a very serious problem with paying attention when spoken to directly. (Tr. 469).

In terms of interacting and relating with others, Golchert reported that plaintiff had no problems seeking attention or expressing anger appropriately, asking

permission appropriately, following rules, respecting/obeying adults in authority, relating experiences and telling stories, using language appropriate to the situation and listener, taking turns in conversation, and using adequate vocabulary and grammar to express thoughts/ideas in everyday conversation; had slight problems introducing and maintaining relevant and appropriate topics of conversation and interpreting meaning of facial expressions; and had obvious problems playing cooperatively with other children and making and keeping friends. (Tr. 470).

On February 23, 2012, plaintiff's 6th grade math and communication arts teacher, Tracey Huebner, completed the same questionnaire. (Tr. 222-229). Huebner wrote that plaintiff had "a great personality, however, she struggles to communicate properly with authoritative adults. She is always tapping/moving around in [the] classroom. [She] can be outright difficult at times, especially when it is challenging her to do something she doesn't want to do at the time." Huebner wrote that she feels as if plaintiff "has great potential as a learner if she can learn to control herself and accept criticism to improve her learning."

In terms of acquiring and using information, Huebner reported that plaintiff had no problems comprehending oral instruction or understanding school and content vocabulary; had slight problems expressing ideas in written form, recalling and applying previously learned material, and applying problem-solving skills in class discussions; had obvious problems reading and comprehending written material and learning new material; and had very serious problems comprehending and doing math problems, understanding and participating in class discussions, and providing organized oral explanations. (Tr. 223).

In terms of attending and completing tasks, Huebner reported that plaintiff had no problems carrying out single-step instructions, waiting to take turns, or working at

a reasonable pace; had slight problems organizing school materials; had obvious problems paying attention when spoken to directly, focusing long enough to finish assigned activity or task, changing from one activity to another without being disruptive, and completing assignments; had serious problems refocusing to a task when necessary and carrying out multi-step instructions; and had very serious problems completing work accurately without careless mistakes and working without distracting herself or others. (Tr. 224).

In terms of interacting and relating with others, Huebner reported that plaintiff had no problems asking for permission or introducing and maintaining relevant and appropriate topics of conversation; had slight problems following rules, relating experiences and telling stories, using language appropriate to the situation and the listener, and using adequate vocabulary and grammar to express thoughts/ideas in general conversation; had obvious problems seeking attention appropriately, taking turns in a conversation, and interpreting meaning of facial expressions, body language, hints, or sarcasm; had serious problems making and keeping friends and respecting/obeying adults in authority; and had very serious problems playing cooperatively with other children and expressing anger appropriately. (Tr. 225).

In terms of caring for herself, Huebner reported that plaintiff had no problems caring for physical needs or personal safety; had slight problems taking care of personal hygiene; had obvious problems being patient, identifying and appropriately asserting emotional needs, and responding appropriately to changes in her own mood; had serious problems using appropriate coping skills to meet daily demands of school environment; and had very serious problems handling frustration appropriately and knowing when to ask for help. (Tr. 227).

## C. Hearing on February 29, 2012

Richard Cowles, Psy.D., a licensed clinical neuropsychologist, provided testimony regarding plaintiff's impairments. (Tr. 129-136, 35-49). Dr. Cowles reviewed plaintiff's medical record and testified that, in his opinion, plaintiff's impairments did not meet or equal any of the medical listings. Dr. Cowles referenced plaintiff's IEP and noted that plaintiff was diagnosed with a sound system disorder and ADHD, that her speech was intelligible despite being affected by a lisp, that she had difficulties staying awake in class, that it was suspected that she was a victim of sexual abuse, and that she had a Global Assessment of Functioning (GAF)[4] score of 48.[5] (Tr. 36). Dr. Cowles referenced plaintiff's medical records from September 2009, which stated that plaintiff had mood swings and was missing school due to somatic complaints. Dr. Cowles referenced plaintiff's medical records from February and May 2010, which stated that she was able to focus and concentrate when on medication, that her tantrums were manageable, and that her defiance improved. (Tr. 36-37).

Dr. Cowles referred to the February 2011 psychological examination, which reported that plaintiff received all A's and one C, and that most of her medical issues began a year prior to the examination. The examination report diagnosed plaintiff with mood disorder and child relational problems, and provided her with a GAF score of 60.[6]

---

[4]The GAF is determined on a scale of 1 to 100 and reflects the clinician's judgment of an individual's overall level of functioning, taking into consideration psychological, social, and occupational functioning. Impairment in functioning due to physical or environmental limitations are not considered. American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders - Fourth Edition, Text Revision 32-33 (4th ed. 2000).

[5] A GAF of 41-50 corresponds with "serious symptoms OR any serious impairment in social, occupational, or school functioning." American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders - Fourth Edition, Text Revision 34 (4th ed. 2000).

[6] A GAF of 51-60 corresponds with "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR difficulty in social, occupational or school functioning (E.g., few friends, conflicts with peers or co-workers)." American

(Tr. 37). Dr. Cowles noted that plaintiff's mother was diagnosed with Borderline Personality Disorder and that plaintiff had marked difficulties in interacting and relating to others and less than marked difficulties in acquiring and using information and attending and completing tasks. (Tr. 38-39).

Dr. Cowles testified that ADHD typically does not cause marked functional limitations, but that generalized anxiety disorder and mood disorder, depending on their severity, could cause marked functional limitations. (Tr. 40-41). Dr. Cowles referenced the questionnaire completed by Lori Hyde and testified that, although her opinions reflected serious limitations, her opinions were inconsistent with plaintiff's IQ score, the opinions of plaintiff's classroom teachers, and her overall grades. (Tr. 43-44).

Plaintiff provided minimal testimony in response to questions posed by the ALJ. (Tr. 50-53). Plaintiff stated that she used to have a best friend until he moved away, that she likes school most of the time, that she listens to her parents some of the time, and that she gets along with her family some of the time. (Tr. 50-52).

Plaintiff's mother also testified at the hearing.[7] (Tr. 53-63). Lewis stated that there is a noticeable difference in plaintiff's disposition when does not take her medication. (Tr. 53-55). Lewis stated that plaintiff does not follow instructions well, that she needs to be reminded to do her chores, and that she does not clean her room or brush her teeth. (Tr. 57-58). Lewis believed that plaintiff's teachers felt sorry for plaintiff and tended to give her higher grades than she actually deserved. Lewis stated

---

Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders - Fourth Edition, Text Revision 34 (4th ed. 2000).

[7]In the hearing transcript and elsewhere in the record, plaintiff's mother is identified as "Valerie Jacks."

that plaintiff was in special education classes for reading and math and that the remainder of her classes were regular education. (Tr. 62). Lewis testified that plaintiff did not have any difficulties using a computer or playing video games, but that plaintiff tended to play less complicated games. (Tr. 62-63).

Lewis stated that in terms of interacting and relating to people, plaintiff had difficulties understanding boundaries and social cues. Lewis expressed concern about plaintiff's ability to stay on task, follow instructions, and not be a distraction to other students in school. (Tr. 64). For example, Lewis stated that plaintiff would get upset and loud when other students would intrude on her desktop space at school. (Tr. 65). Lewis testified that plaintiff had difficulties getting along with children her own age and that her classmates had a history of bullying her. (Tr. 66-68).

### D. **Medical Evidence**

On June 15, 2009, plaintiff saw John Hopkins, M.D. at Lebanon Pediatrics for a follow up regarding her ADHD. (Tr. 232-238). Plaintiff had trouble completing school assignments, but her overall inattention and impulsivity improved. Lewis reported that she gave plaintiff a "two-week break" from her medication and noticed an increase in hyperactivity. Dr. Hopkins discontinued the Strattera prescription and replaced it with Vyvanse.[8] She was instructed to take one caplet per day. On July 31, 2009, plaintiff returned to Dr. Hopkins with reports that she had not been taking her medication as

---

[8] Vyvanse is a central nervous system stimulant indicated for the treatment of ADHD. http://dailymed.nlm.nih.gov/dailymed/lookup.cfm?setid=704e4378-ca83-445c-8b45-3cfa51c1ecad (last visited May 5, 2014).

directed. (Tr. 239-241). Dr. Hopkins discontinued Vyvanse and prescribed Adderall XR[9] with instructions to take one caplet daily.

On September 8, 2009, plaintiff saw Dr. Hopkins for a follow up appointment. (Tr. 242-245). Treatment notes state that plaintiff was put back on Strattera because, despite having some hyperactivity, she tended to be more calm when taking Strattera. Jacks reported that plaintiff had bouts of nausea and vomiting. Dr. Hopkins prescribed Ranitidine[10] for the nausea.

On September 22, 2009, plaintiff presented to Pathways Community Behavioral Healthcare (Pathways). (Tr. 253). A multiaxial assessment revealed a diagnosis of ADHD with a GAF score of 48. (Tr. 269-277). On October 6, 2009, plaintiff returned to Pathways to meet with counselor Marcia Landers. At the end of the session, they agreed to continue meeting on a regular basis. (Tr. 253, 267-268). Plaintiff returned for seven counseling sessions in the remainder of 2009, 27 sessions in 2010, and 21 sessions in 2011. (Tr. 254-262, 382-448). Each session ranged from 30 minutes to an hour and various topics were discussed, including the divorce of her parents; her relationship issues with her parents, classmates, and siblings; and her struggles with school. Landers noted that plaintiff generally appeared sad, but denied being depressed. Landers counseled plaintiff on how to process and manage emotions, how to take responsibility for her actions, and empathy awareness. Landers also counseled

---

[9] Adderall XR is the brand name for a combination of Amphetamine and Dextroamphetamine, and is used to control symptoms of ADHD. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601234.html (last visited May 5, 2014).

[10] Ranitidine is used to treat ulcers, gastroesophageal reflux disease; a condition in which backward flow of acid from the stomach causes heartburn and injury of the food pipe; and conditions where the stomach produces too much acid. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601106.html (last visited May 5, 2014).

plaintiff's parents on the importance of getting plaintiff to bed at an appropriate hour, administering medication on a regular basis, and the need for them to be less argumentative and more supportive.

On September 29, 2009, plaintiff saw Harcharan Bains, M.D. at Pleasant Hope Family Medical for the purpose of establishing care. (Tr. 293-296). Dr. Bains listed plaintiff's diagnosis as ADHD with OCD and gave her a GAF score of 50. Plaintiff was prescribed Tenex and Zoloft. On November 3, 2009, plaintiff returned to Dr. Bains for a follow up appointment. (Tr. 291-292). Treatment notes state that plaintiff was doing better focusing and completing tasks in school and that she appeared less depressed. Plaintiff was instructed to continue her current medications.

On February 9, 2010, plaintiff returned to Dr. Bains for a follow up. (Tr. 289-290). Treatment notes state that plaintiff was doing very well, made honor roll in school, and was able to focus and complete tasks. Dr. Bains noted that plaintiff was not taking Tenex as directed because her mother tended to forget about the evening dose. On April 6, 2010, plaintiff returned to Dr. Bains with reports of increased negative behaviors. (Tr. 286-288). Treatment notes state that plaintiff's parents were in the process of a divorce. Dr. Bains discontinued Tenex, prescribed Intuniv,[11] and increased the dosage of Zoloft. On April 27, 2010, plaintiff returned to Dr. Bains with reports of increased hyperness and impulsiveness. (Tr. 283-284). Treatment notes state that plaintiff was splitting her time between her the homes of her mother and father and that she had temper tantrums when at her mother's home. Dr. Bains increased the dosage of Intuniv. On May 18, 2010, plaintiff returned to Dr. Bains.

---

[11] Intuniv is a brand name for Guanfacine, which is used alone or in combination with other medications to treat high blood pressure or to control symptoms of ADHD. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601059.html (last visited May 2, 2014).

Plaintiff reported that since Intuniv's dosage was increased, she was able to focus and concentrate at school and complete tasks. (Tr. 281-282). Plaintiff's mother reported that plaintiff's temper tantrums were manageable and that her defiance and argumentative behavior had improved.

On May 25, 2010, plaintiff saw Dr. Hopkins for a well child visit. Dr. Hopkins wrote that plaintiff had a healthy exam, that she suffered from ADHD, and that her depression was stable. (Tr. 366-370). On June 8, 2010, a childhood disability evaluation form was completed and signed by Steven Akeson, Psy.D., who wrote that plaintiff had no limitations with acquiring or using information, moving about or manipulating objects, or caring for herself. Dr. Akeson opined that plaintiff had less than a marked limitation in attending or completing tasks and in interacting or relating with others. (Tr. 297-302).

On August 10, 2010, plaintiff returned to Dr. Bains. (Tr. 345-347). Lewis reported that plaintiff was unable to focus, concentrate, or complete tasks, but that her temper tantrums were manageable, her argumentative behavior was somewhat improved, and that she slept well when she took her medications as directed. Dr. Bains increased the Strattera dosage from 50mg to 60mg.

On September 11, 2010, plaintiff presented to the emergency room at St. John's Breech Regional Medical Center with complaints of abdominal pain. (Tr. 451-460). Plaintiff underwent a CT scan of the abdomen and pelvis, which revealed normal results. (Tr. 457, 459-460). Plaintiff was discharged with instructions to drink lots of liquids and take over the counter magnesium citrate. (Tr. 458).

On September 21, 2010, plaintiff returned to Dr. Bains. Treatment notes state that plaintiff was able to focus and concentrate, but that she had difficulties staying awake in class. Lewis stated that she was giving plaintiff 50mg of Strattera on the

weekends, instead of the prescribed 60mg. Dr. Bains instructed plaintiff to take Intuniv in the evenings, instead of the mornings, in order to reduce her fatigue at school. Dr. Bains instructed plaintiff's mother to be more complaint in administering the correct doses of medications. (Tr. 348-350). On October 5, 2010, plaintiff reported to Dr. Bains that she was less fatigued, was able to focus, and had no behavioral problems. (Tr. 351-353).

On November 30, 2010, plaintiff reported to Dr. Bains that she was experiencing increased fatigue at school. Lewis expressed her opinion that plaintiff intentionally fell asleep when she was frustrated or to be defiant. Treatment notes state that plaintiff was occasionally aggressive towards younger children at school, but that her grades were good and that her school had not reported any recent behavioral problems. Dr. Bains discontinued Intuniv because of the cost and substituted it with Tenex. (Tr. 354-355). On January 31, 2011, Lewis reported that plaintiff was no longer falling asleep at school, but that she was defiant at home and had mild anger outbursts without aggression. Plaintiff stated that she felt sad and "stupid." Treatment notes attribute most of her stress to her parent's divorce. (Tr.356-357).

On February 15, 2011, plaintiff received a psychological evaluation from Cathy Grigg, Psy.D., which was requested by plaintiff's counselor for the purpose of determining possible treatment needs. (Tr. 316-325). Plaintiff was described to have good personal hygiene and a cooperative and pleasant demeanor. Plaintiff appeared reluctant to answer questions and asked to take two 5-minute naps during the testing process. Lewis told Dr. Grigg that she was diagnosed with Borderline Personality Disorder, that she took Paxil[12] during her entire pregnancy with plaintiff, and that she

---

[12] Paxil is the brand name for Paroxetine and is used to treat depression, panic disorder, and social anxiety disorder. http://www.nlm.nih.gov/medlineplus/druginfo/

was emotionally absent during plaintiff's infancy and early childhood.  Lewis reported that she believed plaintiff was sexually abused by a foster child who once lived in their home.  Plaintiff described her mood as "usually somewhere between happy and sad" and reported that "sometimes her brain [told] her to do things." (Tr. 319).

Dr. Grigg wrote that "[g]iven the unstable nature of [plaintiff's] environment and the exposure to Borderline Personality Disorder . . . it is possible that the interpersonal difficulties [plaintiff] presents stem from this dynamic.  This dynamic would also explain reports of mood swings, aggression, and conduct problems." (Tr. 323). Dr. Grigg further stated that medication side effects could also contribute to some of plaintiff's general symptoms. Plaintiff's diagnostic impressions were listed as ADHD, mood disorder, parent-child relational problems, problems with primary support group, and problems related to the social environment. She was given a GAF score of 60.[13] Dr. Grigg determined that plaintiff did not meet the criteria for OCD, psychosis, or depression, and that there were no overt symptoms of Asperger's disorder. (Tr. 324). Dr. Grigg recommended that plaintiff continue individual counseling with a focus on social skills, mood symptoms, behavioral concerns, and attachment; that she learn more adaptive and healthy ways to express emotion; that she involve herself in activities involving socializing with peers, such as joining a club or a team sport; that she obtain a neurological evaluation to cancel out any possible brain trauma; that she undergo more intensive and focused evaluation to rule out asperger's disorder; and

meds/a698032.html (last visited May 6, 2014).

[13]  A GAF of 51-60 corresponds with "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR difficulty in social, occupational or school functioning (E.g., few friends, conflicts with peers or co-workers)."  American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders - Fourth Edition, Text Revision 34 (4th ed. 2000).

that her medication compliance be monitored. Dr. Grigg also suggested family counseling. (Tr. 325).

On March 22, 2011, plaintiff returned to Dr. Bains. She reported that she was able to focus and concentrate, but had some drowsiness at school and occasionally felt sad. Dr. Bains recommended that plaintiff seek therapy because of her parent's divorce. (Tr. 358-359). On May 16, 2011, plaintiff again reported that she was able to focus and concentrate in school, but that she had frequent episodes of anger. Plaintiff was again instructed to seek therapy and continue medication as prescribed. (Tr. 360-361). On July 11, 2011, plaintiff returned to Dr. Bains. Plaintiff again reported that she was able to focus and concentrate, but that she was still experiencing episodes of anger and outbursts. Treatment notes state that plaintiff's family would be relocating and that they would seek another doctor. (Tr. 362-363).

On July 29, 2011, plaintiff saw Dr. Hopkins for the purpose of requesting a psychiatry referral. Plaintiff stated that she wanted a second opinion regarding her diagnosis because her mother believed she had asperger's syndrome. (Tr. 371-372). A referral was provided and on August 1, 2011, plaintiff presented to Ward Lawson, Ph.D., at Tri-County Psychological Services. (Tr. 375-379). Dr. Lawson noted that plaintiff's mother was on disability due to a diagnosis of Borderline Personality Disorder and that plaintiff's adopted sister was also on disability. Dr. Lawson noted that plaintiff's parents were foster parents for approximately 100 foster children and that some of those children, including her three biological siblings, had varying mental illnesses. Dr. Lawson observed that plaintiff's mother was "rather transparent about her motive for the evaluation, that is, [plaintiff] being awarded disability benefits." After administering a full mental status exam, Dr. Lawson concluded that plaintiff was "a mentally ill child, with a mentally ill brother, embedded in a dysfunctional family."

Dr. Lawson wrote that a diagnosis of asperger's disorder was "doubtful" and that the "more likely problem" was mood disorder.

On February 22, 2012, plaintiff presented to Deborah Walker, Psy.D, for a social-emotional functioning assessment at the request of plaintiff's attorney. (Tr. 495-498). Plaintiff scored within an average range for cognitive ability and achievement, while an attention deficit disorder evaluation revealed a need for clinical intervention. Dr. Walker expressed his opinion that plaintiff did not have asperger's disorder because the full set of symptoms were not reported by plaintiff's teachers and that although plaintiff had a severe social deficit, it was likely due to the severity of her ADHD coupled with anxiety and mood symptoms. Dr. Walker noted that plaintiff was raised in a chaotic environment, that her parents were career foster parents, that her mother suffered from Borderline Personality Disorder, and that without intervention plaintiff is likely to become more depressed. (Tr. 497). Plaintiff was given a GAF score of 57.

On February 27, 2012, Dr. Walker completed an individual functional assessment form. Dr. Walker reported that plaintiff had a less than marked[14] limitation in acquiring and using information, moving about and manipulating objects, and caring for herself. Dr. Walker reported that she had a marked limitation in attending and completing tasks and an extreme[15] limitation in interacting and relating to others. (Tr. 506-507).

On February 28, 2012, Cindy Savage, a "long time family friend," also completed an individual functional assessment form. Savage reported that plaintiff had a marked

---

[14] "Marked" is defined as a limitation which interferes seriously with the child's ability to independently initiate, sustain, or complete activities noted in a category.

[15] "Extreme" is defined as a limitation which interferes very seriously with the child's ability to independently initiate, sustain, or complete activities noted in a category. An extreme limitation is the worst degree of limitation and sometimes includes a total lack of ability to function in that domain.

limitation in acquiring and using information and caring for herself and an extreme limitation in interacting and relating to others and moving about and manipulating objects. Savage wrote that plaintiff had to be told several times to complete a task, had to be reminded to stay on task, does not finish projects, does not use her time wisely, does not know the proper tone of voice to use when interacting, does not know or respect personal boundaries, does not understand that her actions make others feel uncomfortable, and has to be told to shower. (Tr. 513-514).

On March 7, 2012, plaintiff saw Darren Facen, M.A. at Pathways. Treatment notes state that plaintiff was having difficulties concentrating and paying attention, had temper tantrum outbursts, and that, over the past two months, she was increasingly defiant. (Tr. 523-526). Plaintiff reported having frequent moments of crying, loneliness, and sadness. Treatment notes state that plaintiff was "taken to Safe Harbor for a safe exam after a man (friend of mom) reportedly exposed himself to her." (Tr. 523). Plaintiff's diagnosis was listed as ADHD, generalized anxiety disorder, and mood disorder. She was given a GAF score of 48 (Tr. 526).

On March 28, 2012, Carre Munoz, BA, CSS, TCM, a community support services worker at Pathways, visited the plaintiff at her mother's home. (Tr. 530). Plaintiff was at her father's house at the time. Munoz and Lewis discussed plaintiff's symptoms, family background, and medications. (Tr. 530). Munoz returned to the home on April 3, 2012 to meet with plaintiff. They discussed plaintiff's school and home life. Munoz wrote that she would continue to visit with plaintiff in order to build a rapport with the family and begin working on goals. (Tr. 534). Munoz re-visited the home on June 11, July 5, July 12, and August 1, 2012. (Tr. 542-453, 546, 553, 568).

On June 11, 2012, plaintiff met with Judith Ovalle Abuabara, M.D. at Pathways for a medication management appointment. (Tr. 537-541). The treatment plan

included continuing with Zoloft for anxiety and depressive symptoms, continuing Concerta ER[16] for ADHD, increasing the dosage of Strattera, and continuing Tenex.

On June 14, 2012, plaintiff began therapy sessions with Roxanne Netzler, LPC, MA. Plaintiff and plaintiff's father discussed the treatment plan and goals for counseling. (Tr. 544). Plaintiff continued to meet with Netzler on July 5, 12, 19, and 26 and August 2, 2012. (Tr. 548, 551, 563, 565, 571).

On July 16, 2012, plaintiff presented to Dr. Abuabara for a reevaluation of her medications. (Tr. 556-559). Dr. Abuabara increased her Zoloft and Strattera dosages, discontinued Concerta ER and Tenex, and began her on Intuniv.

### III. **The ALJ's Decision**

In the decision issued on April 12, 2012, the ALJ made the following findings:

1.  Plaintiff was born on September 10, 1999. Plaintiff was an adolescent on April 7, 2010, the date the application was filed, and is currently an adolescent.

2.  Plaintiff has not engaged in substantial gainful activity since April 7, 2010, the application date.

3.  Plaintiff has the following severe impairments: ADHD and speech and language delays.

4.  Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5.  Plaintiff does not have an impairment or combination of impairments that functionally equals the severity of the listings (20 C.F.R. 416.924(d) and 416.926(a)).

6.  Plaintiff has not been disabled, as defined in the Social Security Act, since April 7, 2010, the date the application was filed.

(Tr. 14-26).

------

[16] Concerta is the brand name for Methylphenidate and is used as part of a treatment program to control symptems of ADHD. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682188.html  (last visited May 9, 2014).

# IV.  Legal Standard

To be eligible for SSI benefits, a claimant must prove that she is disabled. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001).  A child under the age of eighteen will be declared disabled if she "has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C).

To determine whether a child claimant is disabled, the Commissioner employs a three-step evaluation process. The Commissioner first determines whether the child is engaged in substantial gainful activity.  If the child is so engaged, she is not disabled. Second, the Commissioner determines whether the child has a "severe impairment."  If the child's impairment is not severe, she is not disabled.  Finally, the Commissioner determines whether the child's impairment meets, medically equals, or functionally equals the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  If the child's impairment is, medically equals, or functionally equals a listed impairment, she is disabled under the Act. 20 C.F.R. § 416.924.

In determining functional equivalence, the Commissioner considers the child claimant's functioning in broad areas of functioning, or "domains."  The six domains are:  (i) acquiring and using information;  (ii) attending and completing tasks;  (iii) interacting and relating with others;  (iv) moving about and manipulating objects;  (v) caring for oneself;  and (vi) health and physical well-being.   20 C.F.R. § 416.926a(b)(1).

For an impairment to functionally equal a listed disability, it must result in either a marked limitation in two domains or an extreme limitation in one domain. 20 C.F.R. § 416.926a.  The Commissioner will find a "marked" impairment in any domain when

the impairment(s) interferes seriously with the claimant's ability to independently initiate, sustain, or complete activities. A "marked" impairment is the equivalent of functioning found on standardized testing with scores that are a least two, but less than three, standard deviations below the mean. 20 C.F.R. § 416.923a(e)(2)(i).  An "extreme" limitation is found in a domain when a claimant's impairment interferes very seriously with the ability to independently initiate, sustain, or complete activities.  It is the equivalent of functioning found on standardized testing with scores that are at least three standard deviations below the mean. 20 C.F.R. § 416.926a(e)(3)(i).

The court must affirm the Commissioner's decision, "if the decision is not based on legal error and if there is substantial evidence in the record as a whole to support the conclusion that the claimant was not disabled." Long v. Chater, 108 F.3d 185, 187 (8th Cir. 1997).  "Substantial evidence is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion." Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2011) (quoting Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2011)). The Court may not reverse merely because the evidence could support a contrary outcome.  Id. at 724.

In determining whether the Commissioner's decision is supported by substantial evidence, the court reviews the entire administrative record. See Stewart v. Sec. of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992).  The court must consider any evidence that detracts from the Commissioner's decision.  Warburton v. Apfel, 188 F.3d 1047, 1050 (8th Cir. 1999).  Where the Commissioner's findings represent one of two inconsistent conclusions that may reasonably be drawn from the evidence, those findings must simply be supported by substantial evidence.  Pearsall, 274 F.3d at 1217 (citing Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000)).

## V. Discussion

Plaintiff contends that the ALJ erred by (1) failing to give proper weight to the medical opinions of Dr. Walker and Dr. Cowles; (2) finding that plaintiff had less than a marked limitation in acquiring and using information and attending and completing tasks; and (3) failing to remand this matter despite the new evidence that was submitted on appeal. [Doc. #22].

## A. Medical Opinions

### Dr. Deborah Walker

Plaintiff contends that the ALJ did not give proper weight to the opinion of Dr. Walker, an examining consultative examiner, who determined that plaintiff had marked limitations in attending and completing tasks and extreme limitations in interacting and relating to others.

In his decision, the ALJ stated that he "considered Dr. Walker's opinion," but found that the medical evidence of record did not support such high degrees of functional restrictions. Instead, the ALJ determined that the evidence of record showed that a regimen of prescription medication was effective in controlling plaintiff's symptoms when the plaintiff took her medication as directed by her physicians. (Tr. 20).

After review of the record and the ALJ's decision, the Court finds that the ALJ did not err in giving less than controlling weight to Dr. Walker's opinion. Dr. Walker saw plaintiff on only one occasion on February 22, 2012. It is well settled that the report of a consulting physician who has seen the claimant only once is of little significance by itself. See Loving v. Dep't of Health & Human Serv., 16 F.3d 967, 971 (8th Cir. 1994) (allowing an ALJ to discount a one-time evaluation); Turpin v. Bowen, 813 F.2d 165, 170 (8th Cir. 1987) ("The report of a consulting physician who examines a claimant once does not constitute 'substantial evidence' upon the record as a whole.").

Furthermore, the ALJ noted that Dr. Walker gave plaintiff a GAF score of 57, which indicates moderate symptoms, and that Dr. Walker's general observations in his report did not support a conclusion of marked or extreme functional limitations, especially when compared to the rest of the medical record.  See Davidson v. Astrue, 578 F.3d 838, 991 (8th Cir. 2009) (An ALJ may assign a medical opinion reduced weight where, as here, it is inconsistent with other evidence in the record); Kelley v. Callahan, 133 F.3d 583 (8th Cir. 1998) (The ALJ is entitled to dismiss or disregard evidence that he or she feels is inconsistent with other evidence).

The ALJ also noted that plaintiff's speech impairment was adequately managed through speech therapy and that plaintiff's ADHD symptoms were controlled when she took her medication as prescribed.  See id. at 846 ("[i]mpairments that are controllable or amenable to treatment do not support a finding of disability.").  The ALJ referenced treatment notes from September 2010, November 2010, and February 2011, which reflected that plaintiff's focus, concentration, and overall behavior improved when she took her medication as prescribed.  The ALJ also noted that when plaintiff's mother failed to administer plaintiff's medication, treatment notes would document increased hyperactivity and distractibility. In fact, plaintiff's mother testified that there is a noticeable difference in plaintiff's disposition when does not take her medication. (Tr. 53-55).  As a result, substantial evidence of record supports that plaintiff's conditions are controlled with medication and, thus, the ALJ did not err in giving less than controlling weight to Dr. Walker's one-time evaluation. See Finch v. Astrue, 547 F.3d 933, 938 (8th Cir. 2008) (an ALJ may "reject the opinion of any medical expert where it is inconsistent with the medical record as a whole.").

**Dr. Cowles**

Plaintiff further contends that the ALJ erred by giving great weight to the opinion of Dr. Cowles, a non-examining medical expert, who testified at the February 29, 2012 hearing that plaintiff had less than a marked limitation in acquiring information, a marked limitation in interacting with others, and no other functional limitations.

Dr. Cowles testified that his opinion was based on the medical evidence of record, including the IEP; treatment notes from 2009 to 2011; Dr. Walker's psychological evaluation; and therapy notes. (Tr. 35-39). Dr. Cowles testified that the overall medical record supported the conclusion that plaintiff had decreased behavioral issues and was consistently able to focus when she took her medication as directed; that she did not suffer from depression; and that her speech was intelligible despite her sound system disorder. Dr. Cowles further noted that plaintiff's highest GAF score was 60. Dr. Cowles stated that he did not agree with Dr. Walker's opinion regarding plaintiff's functional limitations because such limitations were not supported by the medical record or by plaintiff's generally good grades in school. Dr. Cowles acknowledged that severe cases of ADHD and mood disorders could cause extreme and marked limitations, but expressed his belief that plaintiff's conditions were not severe enough to warrant such limitations.

The ALJ attributed great weight to Dr. Cowles' opinion because it was "well supported by the medical evidence of record." (Tr. 20). In making a disability determination, the ALJ shall "always consider the medical opinions in [the] case record together with the rest of the relevant evidence." 20 C.F.R. § 404.1527(b). Before weighing Dr. Cowles' opinion, the ALJ thoroughly considered the testimony of plaintiff and plaintiff's mother, medical treatment notes reflecting that plaintiff's behavior improved when on medication, school records regarding plaintiff's sound system disorder, the results of two psychological consultative examinations, and plaintiff's

elementary school grades and IQ score. It was only after this thorough review of the record that the ALJ determined that Dr. Cowles' opinion was supported by the record evidence as a whole. Thus, the Court finds no error with the ALJ's treatment of Dr. Cowles' opinion.

## B. Functional Limitations

Plaintiff contends that the ALJ erred in finding that plaintiff had less than a marked limitation in acquiring and using information and less than a marked limitation in attending and completing tasks. (Tr. 21-22).

For an impairment to functionally equal a listed disability, it must result in either a marked limitation in two domains or an extreme limitation in one domain. 20 C.F.R. § 416.926a. A marked impairment interferes seriously with the claimant's ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.923a(e)(2)(i). An extreme limitation interferes very seriously with the ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(3)(I). The ALJ's decision must be based on substantial evidence in the record as a whole. Long, 108 F.3d at 187 (8th Cir. 1997). The Court may not reverse merely because the evidence could support a contrary outcome. Estes, 275 F.3d at 724.

The Court finds that substantial evidence supports the ALJ's determinations. In terms of acquiring and using information, the ALJ noted that plaintiff's grades were fairly good overall. This observation is supported by the record. As of December 21, 2010, plaintiff earned four B's and a C and her IQ score was described to be in the "average" range of intellectual functioning. (Tr. 207, 322). Plaintiff's IEP showed that 80% of her classes were regular education classes and that despite her speech disorder, plaintiff had a "conversational level of speech with more than 90% accuracy." (Tr. 202, 330). Dr. Walker opined that plaintiff had a less than marked limitation in

acquiring and using information and plaintiff's regular education teacher did not find plaintiff to have any serious problems. (Tr. 468, 506-507). Plaintiff's speech therapist reported that plaintiff had a serious problem comprehending oral instructions and an obvious problem understanding and participating in class discussions, but that in all other areas of acquiring and using information, plaintiff had no problems or slight problems. (Tr. 477). Although plaintiff's mother testified that plaintiff's teachers gave her better grades because they felt sorry for her, this belief is unsupported by the educational record. Thus, substantial evidence supports the ALJ's determination that plaintiff has less than a marked impairment in the area of acquiring and using information.

In terms of attending and completing tasks, the record is replete with references regarding plaintiff's increased ability to focus, concentrate, and stay awake in class when she takes her medication as directed. <u>See</u> Tr. 36-37, 281,282, 287-292, 348-353, 358-363. Physicians repeatedly counseled plaintiff's mother on the importance of ensuring that plaintiff is administered her medications as directed. From September 29, 2009 to July 11, 2011, plaintiff regularly reported to her physicians that she was able to focus and concentrate at school. <u>Id.</u> Additionally, plaintiff's regular education teacher and speech therapist did not report very serious problems in this area. Thus, substantial evidence supports the ALJ's determination that plaintiff had less than a marked impairment in attending and completing tasks.

### C. Evidence Submitted After the ALJ's Decision

Plaintiff contends that the Appeals Council did not properly consider the additional evidence she submitted, which included: (1) a school attendance record for the dates of May 29, 2012 through June 22, 2012 (Tr. 219); (2) an SSA questionnaire completed by plaintiff's teacher, Tracey Huebner, dated February 23, 2012 (Tr. 222-

229); and (3) medical records from Pathways, dated June 11, 2012 through August 6, 2012 (Tr. 536-573).

Plaintiff points to the Appeal Council's denial, which stated: "In looking at your case, we considered the reasons you disagree with the decision and the additional evidence listed on the enclosed Order of Appeals Council.  We found that this information does not provide a basis for changing the [ALJ's] decision." (Tr. 1-2).  Plaintiff argues that this conclusory statement shows that no meaningful review was given of plaintiff's appeal in this case.

When a plaintiff presents new evidence to the Appeals Council, the regulations provide that the Appeals Council must evaluate the entire record, including any new and material evidence that  relates to the period before the date of the ALJ's decision.  20 C.F.R. § 404.970(b); Cunningham v. Apfel, 222 F.3d 496, 500 (8th Cir. 2000).  The newly submitted evidence becomes part of the administrative record, even though the evidence was not originally included in the ALJ's record.  Id.  This Court does not review the Appeal's Council's denial but determines whether the record as a whole, including the new evidence, supports the ALJ's determination.  Id.

After careful review of the entire record, including the new evidence, the Court finds that the ALJ's determination is supported by substantial evidence. The attendance record, which plaintiff submitted to the Appeals Council, shows that between the dates of May 29, 2012 through June 22, 2012, plaintiff was absent one and one half days.  This information does not affect the ALJ's decision.  Additionally, the records from Pathways primarily consist of brief summaries of counseling sessions, in which plaintiff's therapist reviewed strategies on how to process emotions, argue less, take accountability for her actions, and utilize empathy.  Plaintiff's parents were also

counseled on how to practice positive parenting skills. Overall, these records do not reflect any discrepancies with the ALJ's determination.

Furthermore, the SSA questionnaire completed by plaintiff's special education teacher, Tracey Huebner, does not detract from the ALJ's decision. Similar to plaintiff's regular education teacher and speech therapist, Huebner reported that in the area of acquiring and using information, plaintiff did not have very serious problems. (Tr. 223). Although Huebner found that, in the area of attending and completing tasks, plaintiff had very serious problems completing work accurately and working without distracting herself or others, this opinion is contrary to plaintiff's regular education teacher and speech therapist, who reported that she did not have very serious problems in either of those areas. (Tr. 224, 468-469, 477-478). Furthermore, Huebner only reported five serious problems out of twenty-three potential problem areas in the categories of acquiring and using information and attending and completing tasks.

## VI. Conclusion

For the reasons discussed above, the Court finds that the Commissioner's decision is supported by substantial evidence in the record as a whole.

Accordingly,

**IT IS HEREBY ORDERED** that the relief sought by plaintiff in her brief in support of complaint [Doc. #22] is **denied**.


_____
CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 2nd day of September, 2014.